## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term
### Grand Jury Sworn in on January 8, 2020

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.** |
| | : | |
| **v.** | : | **Grand Jury Original** |
| | : | |
| **EDWARD DAVIES** | : | |
| **(Counts 2, 4, 5, 6, 9)** | : | |
| | : | **18 U.S.C. § 1343 (Wire Fraud);** |
| **and** | : | **22 D.C. Code § 3223(b)(5),(d)(2) (Credit** |
| | : | **Card Fraud); 18 U.S.C. § 981(a)(1)(C),** |
| **EARL HAMILTON,** | : | **21 U.S.C. § 853(p), 28 U.S.C. § 2461(c)** |
| **(Counts 1, 3, 7, 8, 10)** | : | **(Criminal Forfeiture).** |
| | : | |
| **Defendants.** | : | |
| | : | |

# I N D I C T M E N T

The Grand Jury charges that, at all times material to this Indictment, on or about the dates stated below:

### Introduction

1.       The DC Children and Youth Investment Trust Corporation ("DC Trust") was a non-profit organization, created in 1999, whose mission was to service the District of Columbia's children, youth, and their families.  The DC Trust was designed as an intermediary to connect philanthropists, government leaders, youth advocates, and representatives from the business community in order to support programs to benefit the children of the District of Columbia.

2.       Almost all of the funding for the DC Trust was provided by the government of the District of Columbia and the United States Department of Education.  The DC Trust's funding from the U.S. Department of Education consisted of federal grant funding under the U.S. Department of

Education Opportunity Scholarship Program ("OSP"), which was designed to provide low-income parents residing in Washington, D.C., with expanded options for the education of their children. The OSP awarded grants on a competitive basis to organizations looking to establish scholarship programs to assist eligible students with attending certain participating non-public District of Columbia elementary or secondary schools.  The DC Trust was a grantee of this program, and the funding it received through the OSP was authorized to be spent solely on scholarships and limited expenses related to the administration of the program.

3.      In October 2012, EDWARD DAVIES became the interim executive director of the DC Trust, and in November 2012, DAVIES became the permanent executive director of the DC Trust.

4.      In November 2012, DAVIES fired the controller of the DC Trust and created a new position called "director of operations and finance."  In December 2012, DAVIES hired EARL HAMILTON to fill that position.

5.      DAVIES and HAMILTON each received an annual salary of over $100,000 as compensation for their work for the DC Trust.

6.      The DC Trust held a bank account, which was assigned an account number ending in "1059," that the DC Trust used as an operating account from which it paid administrative expenses.  There was a checkcard associated with this account that could be used to make business purchases.  When DAVIES became executive director of the DC Trust, he became the only employee signatory for the account that was linked to this checkcard.  On January 29, 2013, HAMILTON was added as an additional employee signatory for this account and, as such, became the only other employee signatory to this account that was linked to the checkcard.

7.      In August 2013, HAMILTON directed one of the DC Trust's accountants to open

corporate credit card accounts with American Express and to issue DC Trust credit cards in the names of DAVIES, HAMILTON, and two additional DC Trust employees.

8.      According to the DC Trust Employee Handbook, which was revised in February 2014 during DAVIES' and HAMILTON'S tenure as leaders of the DC Trust, "Corporate Credit Card usage must be related to official verifiable company expenditures.  Charges applicable to personal expenses are not acceptable under any circumstances.  Examples of Official Company Expenditures with prior authorization of Departmental Managers are:  office supplies, business travel or client related meals, lodging, car rental, airline baggage fees, taxi service, etc."

9.      The DC Trust also had a travel reimbursement policy, effective March 23, 2009, under which work-related travel expenses were reimbursable; however, the policy cautioned employees that "care  should be  taken to identify a room at a reasonable rate aligned with the allowable rate for the hosting city according  to  the  General  Services  Administration's  (GSA) rate  schedule."  Similarly, the policy stated that meals consumed during authorized work-related travel would be reimbursed according to "the GSA per diem schedule for meals and incidentals."

10.      According to DC Trust employees and board members, the commuting costs of employees and officers were not reimbursable.

11.      One of the DC Trust's two accountants was responsible for obtaining receipts submitted by DC Trust staff who used the DC Trust credit cards, including DAVIES and HAMILTON, and reconciling each month's credit card statements in the company's ledger.

12.      The DC Trust was governed by a board of directors, which held regular meetings at which DAVIES and HAMILTON were required to give reports about the organization's activities and finances.  The board had no finance committee until one was created in late 2015 by the chair of the board at the time, who wanted to improve the board's financial oversight of DC Trust.

## COUNTS ONE THROUGH EIGHT
### (Wire Fraud)

13.     Paragraphs 1 through 12 of this Indictment are hereby re-alleged.

14.     Between October 1, 2012, and February 29, 2016, in the District of Columbia and elsewhere, the defendants,

**EDWARD DAVIES** and
**EARL HAMILTON**,

devised and intended to devise a scheme and artifice to defraud and obtained and intended to obtain money and property by means of false and fraudulent pretenses, representations, and promises— that is, DAVIES and HAMILTON intended to defraud the DC Trust of money and property through fraudulent transactions and other means as more fully described below.

### Purpose of the Scheme to Defraud

15.     A purpose of the scheme was for DAVIES and HAMILTON to steal D.C. Trust funds for personal purposes and expenses.

### Manner and Means

16.     DAVIES and HAMILTON perpetrated this scheme to defraud by using DC Trust's bank checkcard and corporate credit cards to make unauthorized personal purchases, by lying to the DC Trust accountants about the nature of these purchases, and by hiding from the board of directors the exorbitant monthly bills that resulted.

### Acts in Furtherance of the Scheme to Defraud

17.     The acts in furtherance of this scheme to defraud included the following acts and omissions, among others, which were taken and made by DAVIES and HAMILTON between October 1, 2012, and February 29, 2016:

    a.  DAVIES and HAMILTON each used the DC Trust checkcard to make numerous
        payments to third parties, for their own personal expenses, to include but not limited

to payments for meals, retail purchases, commuting costs, and personal travel. DAVIES and HAMILTON were not authorized to use the funds of DC Trust for purely personal transactions such as these.  For example:

    i.  DAVIES used the DC Trust checkcard to pay $247.36 for a stay at the Rouge hotel, in Washington, D.C., from December 31, 2012, through January 1, 2013 (New Year's Eve).  On December 31, 2012, DAVIES also used the DC Trust checkcard to pay $72.00 at Old Ebbitt Grill, a bar and restaurant in Washington, D.C.

    ii.  HAMILTON used the DC Trust checkcard to pay Hertz Car Rental $616.92 on February 22, 2013, and he also used the DC Trust checkcard to pay Hertz $403.94 on February 26, 2013, when he returned the car.  According to records provided by Hertz, HAMILTON picked up and returned the rental car at the airport in Atlanta, Georgia, traveling a total of 2,207 miles during the course of the trip.  During this time frame, HAMILTON used the DC Trust checkcard to pay $962.05 for a stay at the Marriott Hotel in Alpharetta, Georgia, to pay $59.04 at a Pilot gas station in Cordele, Georgia, to purchase $62.71's worth of gas at a RaceTrac gas station located in Rivera Beach, Florida, and to make a $1,780.52 purchase at a Best Buy located in Palm Beach, Florida.

b.  DAVIES used the DC Trust credit card in his name to make over 600 payments to third parties, for his own personal expenses, to include but not limited to payments for meals, groceries and other retail purchases, commuting costs, personal automobile expenses, personal travel, and the personal travel of family members and

friends.  DAVIES was not authorized to use the funds of the DC Trust for purely
personal transactions such as these.  Some examples of these personal transactions
include but are not limited to:

    i.   During the entire period of October 1, 2012, through February 29, 2016,
DAVIES used the DC Trust credit card to make a total of over $2,000 in
purchases at Target stores in the area, mostly in Maryland, where DAVIES
resided at the time.

    ii.   During the entire period of October 1, 2012, through February 29, 2016,
DAVIES used the DC Trust credit card to make approximately $800 in
purchases at Home Depot stores in the area, mostly in Maryland, where
DAVIES resided at the time.

    iii.   During the entire period of October 1, 2012, through February 29, 2016,
DAVIES charged roughly $1700 in Metrorail charges to the DC Trust credit
card.

    iv.   During the entire period of October 1, 2012, through February 29, 2016,
DAVIES made about $1,400 of purchases at Commissary restaurant in the
Logan Circle neighborhood of Washington, D.C., near the location of the
D.C. Trust office.  Most of these purchases were in amounts of about $30.

    v.   During the period of October 1, 2012, through February 29, 2016, DAVIES
made over $650 of purchases at Bua Thai restaurant, in the Logan Circle
neighborhood of Washington, D.C., near the location of the DC Trust office.
The average cost of these purchases was about $40.

    vi.   On Saturday, September 7, 2013, DAVIES charged $264 at a Red Door

Salon in Washington, D.C., to the DC Trust credit card.

vii.  DAVIES used his DC Trust credit card to pay $710.14 for a car rental from Enterprise for the dates of October 10-14, 2013, which comprised Columbus Day weekend that year.  That same weekend, DAVIES used his DC Trust credit card to make purchases from merchants and retailers in Virginia, South Carolina, and Georgia.  DAVIES was attending a wedding in Georgia during this weekend.

viii.  On November 5, 2013, DAVIES used his DC Trust credit card to make a $502.75 personal car loan payment.

ix.  DAVIES used the DC Trust credit card to pay $680 for plane tickets for himself and a relative to fly from Baltimore, Maryland, to Manchester, New Hampshire, for the weekend of Friday, May 16, 2014, through Sunday, May 18, 2014, as well as $294.74 for lodging and $277.61 for a rental car while DAVIES and his relative were in New Hampshire that weekend.

x.  DAVIES used the DC Trust credit card to pay roughly $300 for hotel expenses in Windsor, Connecticut from May 24-26, 2014 (Memorial Day Weekend).  DAVIES was attending graduation festivities for a relative this weekend.

xi.  On November 17, 2014, DAVIES used his DC Trust credit card to make a $2,000 payment to Pohanka Automotive Group for a partial down-payment on a personal vehicle, which was registered in DAVIES' name.

xii.  On November 19, 2014, DAVIES used his DC Trust credit card to purchase two round-trip Amtrak tickets, for a total of $736, for himself and an

acquaintance to travel to New York from Wednesday, November 26, 2014, through Saturday, November 29, 2014.  (Thanksgiving fell on Thursday, November 27, 2014.)  During this holiday trip to New York, DAVIES used the DC Trust credit card to make additional payments, including but not limited to approximately $250 towards hotel charges and over $400 in charges for a massage service.

xiii.   DAVIES used the DC Trust credit card to pay numerous expenses for a trip that he took to California in April 2015, with an acquaintance, the acquaintance's daughter, and DAVIES' daughter.  The expenses charged to the DC Trust card included but were not limited to: a total of roughly $3,000 for round-trip airfare for himself and his three travel companions (including a $30 premium seat upgrade fee for each ticket, nearly $500 in change fees after an initial reservation was amended, and $175 in extra baggage fees); $765.46 for lodging in Oakland, California; $1,009.16 for a "King, atrium-view" hotel room in Napa, California; $493.05 for a rental car to drive from Oakland to Napa; and hundreds of dollars in restaurant tabs and other personal purchases made over the course of this vacation.

xiv.   DAVIES used the DC Trust credit card to purchase airline tickets for himself, an acquaintance, and the acquaintance's daughter to fly to Los Angeles on Friday, July 3, 2015, and return on Monday, July 6, 2015.  Each of these tickets cost $504.20.  DAVIES also used the DC Trust credit card to pay more than $300 in restaurant- and hotel-related charges during this trip.

xv.   DAVIES used the DC Trust credit card to pay $100.52 for a room at the

Westin Washington hotel in Washington, D.C., for Sunday, December 13, 2015.

xvi.   On Tuesday, December 15, 2015, DAVIES used the DC Trust credit card to pay $176.00 for a dinner for two at The Riggsby restaurant in Washington, D.C.

xvii.   DAVIES traveled to Chicago, Illinois on December 23, 2015, and returned home on December 25, 2015.  While in Chicago, DAVIES used the DC Trust credit card to pay a $120 tab at The Marq restaurant and a $172 bill at Fat Rice restaurant.  DAVIES also used the DC Trust credit card to pay $66 for parking at Baltimore Washington International Airport while he was on this trip.

xviii.   Days later, DAVIES returned to Chicago for New Year's Eve 2015/2016. DAVIES used the DC Trust credit card to pay $763.20 to pay for round-trip plane tickets and $50 for parking at Washington Reagan National Airport ("National Airport") for this trip.

c.   HAMILTON used the DC Trust credit card in his name to make over 600 payments to third parties, for his own personal expenses, to include but not limited to payments for meals, retail purchases, personal automobile expenses, and personal travel. HAMILTON was not authorized to use the funds of DC Trust for purely personal transactions such as these.  For example:

i.   During the entire period of October 1, 2012, through February 29, 2016, HAMILTON used the DC Trust credit card to make approximately $2,500 in purchases at Home Depot stores in Maryland, Virginia, Florida, and

Illinois.

ii.  On August 24, 2013, HAMILTON charged $266.90 on his DC Trust credit card for automobile-related expenses at Palm Beach Auto in Lake Park, Florida, near where HAMILTON owns a home.  This was only the second charge HAMILTON ever made using the card.

iii. On August 27, 2013, October 9, 2013, September 21, 2014, and June 24, 2014, Hamilton charged $353.80, $423.60, $268.99, and $109.00, respectively, on his DC Trust credit card, to purchase plane tickets for his wife to fly between the Washington, D.C., metropolitan area and Fort Lauderdale, Florida, near where HAMILTON owns a home.  For the trip on September 22, 2014, HAMILTON also purchased himself a $268.99 plane ticket using the DC Trust credit card.

iv.  In November 2013, HAMILTON used his DC Trust credit card to book a $982.00 cruise on Royal Caribbean lines.  While on that vacation, on November 12, 2013, HAMILTON used his DC Trust credit card to make one $152.60 purchase and one $49.05 purchase at Andy's Gift Shop in Ocho Rios, Jamaica.  HAMILTON also used the DC Trust credit card to pay $154 for parking at National Airport during this time period.

v.   Over Christmas week in 2013, HAMILTON used his DC Trust credit card to pay for numerous expenses while traveling, to include: $57.50 for gasoline in New Springfield, Ohio, on December 24, 2013; $85.00 for gasoline in Lansing, Illinois, on December 26, 2013; $85.50 at a movie theater in Country Club Hills, Illinois, on December 26, 2013; $46.51 for gasoline in

Verona, Pennsylvania, on December 28, 2013; $57.25 for gasoline in West Unity, Ohio, on December 28, 2013; and $43.58 at a Pizza Hut in Woodbridge, Virginia, on December 30, 2013.

vi.   On January 11, 2014, HAMILTON used his DC Trust credit card to purchase $106.65 in tickets to see comedian Rickey Smiley.

vii.  On July 16, 2014, September 4, 2014, October 13, 2014, April 9, 2015, and September 14, 2015, HAMILTON used his DC Trust credit card to pay $272.19, $147.88, $208.78, $678.36, and $294.62, respectively, for repairs/servicing to his personal vehicle at BMW of Alexandria.   On September 4, 2014, HAMILTON also used the DC Trust credit card to pay nearly $600 at Washington Tires.

viii. On November 11, 2014, HAMILTON purchased a plane ticket for his son to fly from Florida to Baltimore, Maryland, on Wednesday, November 26, 2014 (the day before Thanksgiving that year).  HAMILTON used the DC Trust credit card to pay $125.09 of the total $165.09 charge for the flight.  A credit card in the name of HAMILTON's wife was used to pay for the remainder of the cost of the flight.

ix.   On December 7, 2014, HAMILTON and his wife flew from Chicago, Illinois, to Baltimore, Maryland, on tickets costing a total of $332.36, which were paid for on HAMILTON'S DC Trust credit card.  HAMILTON also used the DC Trust credit card to pay $18 for parking at the airport while he and his wife were traveling.

x.    On June 8, 2015, and June 16, 2015, HAMILTON used the DC Trust credit

card to pay for servicing of his 2006 Mercedes-Benz CLS 500. Each
diagnostic check cost $137.95.

    xi. On November 7, 2015, HAMILTON made a $14.45 payment using his DC
Trust credit card at a Subway restaurant, located in the District of Columbia.

    xii. On December 19, 2015, HAMILTON used the DC Trust credit card to
purchase a $701.84 Nordictrac exercise machine, which was delivered to his
personal residence in Virginia.

    xiii. On January 2, 2016, HAMILTON used the DC Trust credit card to pay for a
$27.94 meal at Bua Thai restaurant. During the period of October 1, 2012,
through February 29, 2016, HAMILTON made over $400 of purchases at
Bua Thai restaurant, in the Logan Circle neighborhood of Washington, D.C.,
near the location of the D.C. Trust office. The average cost of these
purchases was about $50.

d. For many of the transactions alleged in subparagraphs (a) through (c) above,
DAVIES and HAMILTON submitted to DC Trust accountants false justifications
or no justification at all, causing the accountants to make inaccurate and incomplete
entries in the DC Trust's internal accounting system.

e. DAVIES and HAMILTON ignored the requirement that a D.C. Trust board member
co-sign checks for more than $25,000 by repeatedly paying credit card bills online
through Automated Clearing House ("ACH") payments. Of the 43 payments made
to pay down the DC Trust credit cards during the time period of October 1, 2012,
through February 29, 2016, 38 of these payments were made via online ACH
payments. Of the remaining five payments made during this period, which were all

12

made by check, only three were for amounts greater than $25,000, and DAVIES and

HAMILTON co-signed all three of these checks, in violation of the policy requiring

the signature of one board member on checks above the $25,000 threshold.

f.   At the regular meetings of the board of directors, DAVIES and HAMILTON gave

presentations about the DC Trust's finances.  At these meetings, they never told the

board that they used the DC Trust checkcard and their DC Trust credit cards to make

unauthorized personal purchases.

### Execution of the Scheme

18.   On or about the dates listed below, in the District of Columbia and elsewhere,

DAVIES and HAMILTON, for the purpose of executing the above-described scheme to defraud,

transmitted and caused to be transmitted by means of wire communication in interstate commerce,

from, into, and through the District of Columbia, the following writings, signals, and sounds:

| Count | Date (Approx.) | Description |
|---|---|---|
| ONE | 11/7/2015 | HAMILTON made a $14.45 payment using his DC Trust credit card at a Subway restaurant, located in the District of Columbia, and in processing the payment, a credit card machine at the restaurant connected electronically to American Express computers/servers located outside the District of Columbia. |
| TWO | 12/2/2015 | From the DC Trust office, DAVIES caused an online ACH payment in the amount of $15,446.18 to be made to pay down the DC Trust credit card balance, which included unauthorized personal purchases, and in the process of making this payment, connected electronically to American Express computers/servers located outside the District of Columbia. |
| THREE | 12/2/2015 | From the DC Trust office, HAMILTON caused an online ACH payment in the amount of $15,446.18 to be made to pay down the DC Trust credit card balance, which included unauthorized personal purchases, and in the process of making this payment, connected electronically to American Express computers/servers located outside the District of Columbia. |
| FOUR | 12/14/2015 | DAVIES made a $100.52 payment using his DC Trust credit card at a Westin Hotel located in the District of Columbia, and in processing the payment, a credit card machine at the hotel connected electronically to |

| | | |
|---|---|---|
| | | American Express computers/servers located outside the District of Columbia. |
| FIVE | 12/15/2015 | DAVIES made a $176 payment using his DC Trust credit card at a The Riggsby restaurant, located in the District of Columbia, and in processing the payment, a credit card machine at the restaurant connected electronically to American Express computers/servers located outside the District of Columbia. |
| SIX | 12/22/2015 | From the DC Trust office, DAVIES caused an online ACH payment in the amount of $11,398.83 to be made to pay down the DC Trust credit card balance, which included unauthorized personal purchases, and in the process of making this payment, connected electronically to American Express computers/servers located outside the District of Columbia. |
| SEVEN | 12/22/2015 | From the DC Trust office, HAMILTON caused an online ACH payment in the amount of $11,398.83 to be made to pay down the DC Trust credit card balance, which included unauthorized personal purchases, and in the process of making this payment, connected electronically to American Express computers/servers located outside the District of Columbia. |
| EIGHT | 01/02/2016 | HAMILTON made a $27.94 payment using his DC Trust credit card at Bua Thai restaurant, located in the District of Columbia, and in processing the payment, a credit card machine at the restaurant connected electronically to American Express computers/servers located outside the District of Columbia. |

**(Wire Fraud, in violation of Title 18, United States Code, Section 1343).**

## COUNT NINE
**(Credit Card Fraud)**

19.      Paragraphs 1 through 12 and 17 of this indictment are hereby re-alleged.

20.      Between November 1, 2015, and February 29, 2016, within the District of Columbia and elsewhere, the defendant,

**EDWARD DAVIES,**

with intent to defraud, obtained and paid for property and services of a value of $1,000 or more by knowingly using for his own purpose a credit card of the DC Trust, and the number on and description of said credit card, which was issued to and provided to DAVIES by and at the request of the DC Trust, who was DAVIES' employer at the time, to be used only for DC Trust purposes.

**(Credit Card Fraud, in violation of 22 D.C. Code, Section 3223(b)(5),(d)(2)).**

## COUNT TEN
**(Credit Card Fraud)**

21.    Paragraphs 1 through 12 and 17 of this indictment are hereby re-alleged.

22.    Between November 1, 2015, and February 29, 2016, within the District of Columbia and elsewhere, the defendant,

**EARL HAMILTON,**

with intent to defraud, obtained and paid for property and services of a value of $1,000 or more by knowingly using for his own purposes a credit card of the DC Trust, and the number on and description of said credit card, which was issued to and provided to HAMILTON by and at the request of the DC Trust, who was HAMILTON'S employer at the time, to be used only for DC Trust purposes.

**(Credit Card Fraud, in violation of 22 D.C. Code, Section 3223(b)(5),(d)(2)).**

## FORFEITURE ALLEGATION

1.    Upon conviction of any of the offenses alleged in Counts One through Ten, the defendants, EDWARD DAVIES and EARL HAMILTON, shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  The United States will also seek a forfeiture money judgment equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

2.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

15

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the

value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c)).**

A TRUE BILL

FOREPERSON

MICHAEL R. SHERWIN
ACTING ATTORNEY FOR THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA