UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | |
| EDWARD DAVIES, ) | CRIMINAL NO. 20-cr-00245-01 (RBW) |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| **Defendants** ) | |

FILED
NOV 30 2022
Clerk, U.S. District and
Bankruptcy Courts

## DEFENDANT DAVIES' STATEMENT OF OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant EDWARD DAVIES and the United States hereby agree and stipulate as follows:

1. The DC Children and Youth Investment Trust Corporation ("DC Trust") was a non-profit organization, created in 1999, whose mission was to service the District of Columbia's children, youth, and their families. The DC Trust was designed as an intermediary to connect philanthropists, government leaders, youth advocates, and representatives from the business community in order to support programs to benefit the children of the District of Columbia.

2. Almost all of the funding for the DC Trust was provided by the government of the District of Columbia and the United States Department of Education. The DC Trust's funding from the U.S. Department of Education consisted of federal grant funding under the U.S. Department of Education Opportunity Scholarship Program ("OSP"), which was designed to provide low-income parents residing in Washington, D.C., with expanded options for the education of their children. The OSP awarded grants on a competitive basis to organizations looking to establish scholarship programs to assist eligible students with attending certain

participating non-public District of Columbia elementary or secondary schools. The DC Trust was a grantee of this program, and the funding it received through the OSP was authorized to be spent solely on scholarships and limited expenses related to the administration of the program.

3. In October 2012, EDWARD DAVIES became the interim executive director of the DC Trust, and in November 2012, DAVIES became the permanent executive director of the DC Trust.

4. In November 2012, DAVIES fired the controller of the DC Trust and created a new position called "director of operations and finance." In December 2012, DAVIES hired EARL HAMILTON to fill that position.

5. DAVIES and HAMILTON each received an annual salary of over $100,000 as compensation for their work for the DC Trust.

6. The DC Trust held a bank account, which had an account number ending in "1059," that the DC Trust used as an operating account from which it paid administrative expenses. There was a check card associated with this account that could be used to make business purchases. When DAVIES became executive director of the DC Trust, he became the only employee signatory for the account that was linked to this check card. On January 29, 2013, HAMILTON was added as an additional employee signatory for this account and, as such, became the only other employee signatory to this account that was linked to the check card.

7. In August 2013, HAMILTON directed one of the DC Trust's accountants to open corporate credit card accounts with American Express and to issue DC Trust credit cards in the names of DAVIES, HAMILTON, and two additional DC Trust employees.

8. According to the DC Trust Employee Handbook, which was revised in February 2014 during DAVIES' and HAMILTON's tenure as leaders of the DC Trust, "Corporate Credit

Card usage must be related to official verifiable company expenditures. Charges applicable to personal expenses are not acceptable under any circumstances. Examples of Official Company Expenditures with prior authorization of Departmental Managers are: office supplies, business travel or client related meals, lodging, car rental, airline baggage fees, taxi service, etc."

9.  The DC Trust also had a travel reimbursement policy, effective March 23, 2009, under which work-related travel expenses were reimbursable; however, the policy cautioned employees that "care should be taken to identify a room at a reasonable rate aligned with the allowable rate for the hosting city according to the General Services Administration's (GSA) rate schedule." Similarly, the policy stated that meals consumed during authorized work-related travel would be reimbursed according to "the GSA per diem schedule for meals and incidentals."

10. According to DC Trust employees and board members, the commuting costs of employees and officers were not reimbursable.

11. One of the DC Trust's two accountants was responsible for obtaining receipts submitted by DC Trust staff who used the DC Trust credit cards, including DAVIES and HAMILTON, and reconciling each month's credit card statements in the company's ledger.

12. The DC Trust was governed by a board of directors, which held regular meetings at which DAVIES and HAMILTON were required to give reports about the organization's activities and finances. The board had no finance committee until one was created in late 2015 by the chair of the board at the time, who wanted to improve the board's financial oversight of DC Trust.

13. Between October 1, 2012, and February 29, 2016, in the District of Columbia and elsewhere, the defendant DAVIES devised and intended to devise a scheme and artifice to defraud and obtained and intended to obtain money and property by means of false and fraudulent

pretenses, representations, and promises—that is, DAVIES intended to defraud the DC Trust of money and property through fraudulent transactions and other means as more fully described below.

14. A purpose of the scheme was for DAVIES to steal D.C. Trust funds for personal purposes and expenses.

15. DAVIES perpetrated this scheme to defraud by using DC Trust's bank check card and corporate credit cards to make unauthorized personal purchases, by lying to the DC Trust accountants about the nature of these purchases, and by hiding from the board of directors the exorbitant monthly bills that resulted.

16. The acts in furtherance of this scheme to defraud included the following acts and omissions, among others, which were taken and made by DAVIES between October 1, 2012, and February 29, 2016:

   a. DAVIES used the DC Trust check card to make numerous payments to third parties, for their own personal expenses, to include but not limited to payments for meals, retail purchases, commuting costs, and personal travel. DAVIES was not authorized to use the funds of DC Trust for purely personal transactions such as these.

   b. DAVIES used the DC Trust credit card in his name to make over 600 payments to third parties, for his own personal expenses, to include but not limited to payments for meals, groceries and other retail purchases, commuting costs, personal automobile expenses, personal travel, and the personal travel of family members and friends. DAVIES was not authorized to use the funds of the DC Trust for purely personal transactions such as these. Some examples of these personal

4

transactions include but are not limited to:

i. During the entire period of October 1, 2012, through February 29, 2016, DAVIES used the DC Trust credit card to make a total of over $2,000 in purchases at Target stores in the area, mostly in Maryland, where DAVIES resided at the time.

ii. During the entire period of October 1, 2012, through February 29, 2016, DAVIES used the DC Trust credit card to make approximately $800 in purchases at Home Depot stores in the area, mostly in Maryland, where DAVIES resided at the time.

iii. During the entire period of October 1, 2012, through February 29, 2016, DAVIES charged roughly $1700 in Metrorail charges to the DC Trust credit card.

iv. During the entire period of October 1, 2012, through February 29, 2016, DAVIES made about $1,400 of purchases at Commissary restaurant in the Logan Circle neighborhood of Washington, D.C., near the location of the D.C. Trust office. Most of these purchases were in amounts of about $30.

v. During the period of October 1, 2012, through February 29, 2016, DAVIES made over $650 of purchases at Bua Thai restaurant, in the Logan Circle neighborhood of Washington, D.C., near the location of the DC Trust office. The average cost of these purchases was about $40.

vi. DAVIES used the DC Trust credit card to pay $100.52 for a room at the Westin Washington hotel in Washington, D.C., for Sunday, December 13, 2015.

    vii. On Tuesday, December 15, 2015, DAVIES used the DC Trust credit card to pay $176.00 for a dinner for two at The Riggsby restaurant in Washington, D.C.

    viii. DAVIES traveled to Chicago, Illinois on December 23, 2015, and returned home on December 25, 2015. While in Chicago, DAVIES used the DC Trust credit card to pay a $120 tab at The Marq restaurant and a $172 bill at Fat Rice restaurant. DAVIES also used the DC Trust credit card to pay $66 for parking at Baltimore Washington International Airport while he was on this trip.

    ix. Days later, DAVIES returned to Chicago for New Year's Eve 2015/2016. DAVIES used the DC Trust credit card to pay $763.20 to pay for round-trip plane tickets and $50 for parking at Washington Reagan National Airport for this trip.

c. For many of their personal transactions using DC Trust's credit and check cards, DAVIES submitted to DC Trust's accountants false justifications or no justification at all, causing the accountants to make inaccurate and incomplete entries in the DC Trust's internal accounting system.

d. DAVIES ignored the requirement that a D.C. Trust board member co-sign checks for more than $25,000 by repeatedly paying credit card bills online through Automated Clearing House ("ACH") payments – credit card bills that included DAVIES's personal purchases. Of the 43 payments made to pay down the DC Trust credit cards during the time period of October 1, 2012, through February 29, 2016, 38 of these payments were made via online ACH payments. Of the remaining

6

five payments made during this period, which were all made by check, only three were for amounts greater than $25,000, and DAVIES co-signed all three of these checks, in violation of the policy requiring the signature of one board member on checks above the $25,000 threshold.

e. At the regular meetings of the board of directors, DAVIES gave presentations about the DC Trust's finances. At these meetings, they never told the board that they used the DC Trust check card and their DC Trust credit cards to make unauthorized personal purchases.

17. On or about January 14, 2016, DAVIES entered into a civil separation agreement with DC Trust in which he admitted that since September 15, 2015, DAVIES made $25,485.42 in unauthorized charges to his corporate credit card in violation of D.C. Trust's policies. DAVIES separated from D.C. Trust on January 11, 2016. Prior to his separation, DAVIS paid back D.C. Trust $6,800 of the stolen funds.

18. Between October 1, 2012, and February 29, 2016, DAVIES fraudulently obtained and paid for property and services of value in the amount of at least $111,332.46 by knowingly using for his own purpose DC Trust's credit and check cards, and the number on and description of said credit and check cards, which were issued to and provided to DAVIES by and at the request of the DC Trust, who was DAVIES' employer at the time, to be used only for DC Trust purposes.

19. This proffer of evidence is not intended to constitute a complete statement of all facts known by defendants EDWARD DAVIES but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. The limited purpose of this proffer is to

7

demonstrate that there exists a sufficient legal basis for defendant's plea of guilty to the charged crime.

Respectfully submitted,

MATTHEW M. GRAVES

United States Attorney
D.C. Bar No. 481052

By: /s/ Diane Lucas

Diane G. Lucas, D.C. Bar No. 443610
Assistant United States Attorney
U.S. Attorney's Office
601 D Street, N.W., Fifth Floor
Washington, D.C. 20530
(202) 252-7724 (Lucas)
Diane.Lucas@usdoj.gov

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Fed. R. Cr. P. 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense, and declare under penalty of perjury that it is true and correct.

Date: 11/17/2022

*Edward Davies*
EDWARD DAVIES
Defendant

I have discussed this Statement of Offense with my client. I concur with his decision to stipulate to this Statement of Offense.

Date: _____

Allen H. Orenberg
Digitally signed by Allen H. Orenberg
Date: 2022.11.17 10:01:12 -05'00'

ALLEN H. ORENBERG, Esquire
Attorney for the Defendant